1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

8
9
10

JAMES NELLUMS,

   *Petitioner*,                                    2:05-cv-00836-RLH-RJJ

vs.                                               ORDER

D.W. NEVENS, *et al.*,

   *Respondents.*

17      This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on

18  the merits on the remaining claims, *i.e.*, on the claims of ineffective assistance of counsel in

19  Grounds 1, 2, 7 and 9.

20                                  ***Background***

21      Petitioner James Nellums seeks to set aside his 1999 Nevada state court conviction,

22  pursuant to a jury verdict, of first degree murder with the use of a deadly weapon, attempted

23  murder with the use of a deadly weapon, robbery with the use of a deadly weapon, and

24  attempted robbery with the use of a deadly weapon.[1]

25

26  ─────────────────

27      [1]Petitioner additionally was convicted in the same judgment of possession of a firearm by an ex-felon, pursuant to a plea.  The claims before the Court do not appear to challenge the conviction on this charge.  To the extent, if any, that petitioner does seek to overturn the conviction on the firearm charge, the Court rejects

28  this challenge for the reasons assigned in footnote 51.

1    The evidence at trial included the following.[2]

2    The surviving victim, Hilario Rodriguez, testified as follows.  On the evening of March

3    25, 1997, he and his father, Nicholas Rodriguez, were taking a neighborhood path through

4    some vacant desert land from their home to a store.  It was approximately 7:50 p.m. in the

5    evening, and it was dark outside.  The only lighting came from streetlights from the streets on

6    two sides of the vacant land.[3]

7    As they were walking through the area, they saw a black male walking toward them.

8    The man pointed a gun at them and said several words in English, but the only word that

9    Hilario Rodriguez understood was "stop."  The man tried to hit Hilario Rodriguez with the gun,

10   causing him to fall backwards.  The man then shot his father, with Rodriguez hearing "about

11   three" gunshots.  Hilario Rodriguez got up and tried to stop the assailant, who then shot him

12   in the right upper arm near his armpit and in his left leg just below the kneecap.  Rodriguez

13   fell to the ground face down, and he thought that he was dying.  He heard the assailant come

14   close to him.  He heard the gun click, but it did not fire.[4]

15   The assailant then pulled Hilario Rodriguez' wallet from his left pocket.  Rodriguez had

16   $2 in the main section of the wallet for bills, and he had another $200 hidden in a credit card

17   slot that he was planning to send to his mother in Mexico.  Rodriguez never saw his wallet

18   again.[5]

19   Hilario Rodriguez saw the man walk a short distance toward a small fence and retrieve

20   a bicycle from the bushes.  The bicycle was a black or dark mountain bike with chrome

21   handlebars.  #15, Ex. 2A, at 55-56, 69-70 & 78.

22

23   ────────────────

24   [2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this case.  No statement of fact made in describing statements, testimony or other

25   evidence in the state court constitutes a finding of fact by this Court.

26   [3]#15, Ex. 2A, at 48-52, 56-58 & 69.

27   [4]Id., at 52-54, 69, 72 & 78-79.

28   [5]Id., at 54-55.

1    The assailant was wearing what appeared in the lighting to be dark blue pants and a

2    dark blue jacket together with a cap.  The gun was a small dark-colored pistol.  The assailant

3    was holding the pistol with both hands, showing only a portion of the barrel.[6]

4    Nicholas Rodriguez did not survive the attack.  Investigating police officers and crime

5    scene investigators recovered a brown wallet about ten feet from where his body was found.

6    He carried a wallet that was consistent with the wallet recovered.  Bicycle tracks were

7    observed nearby.  Investigators observed a multitude of bicycle tire tracks in the desert in the

8    general area, including a wavy, knobby type of tread consistent with a mountain bike.  The

9    area was well-traveled, however, making it difficult to tie the tracks to a particular bicycle.[7]

10    Investigators initially recovered an unexpended .25 caliber cartridge with the initials

11    "R.P." on it.  At dawn the following morning, Maria Rodriguez, Nicholas Rodriguez' daughter-

12    in-law, also observed three shell casings at the crime scene.  She picked up the casings, and

13    she placed them in a plastic bag when she returned to the nearby house.  After going to

14    Mexico to bring Nicholas Rodriguez' wife to Las Vegas, Maria Rodriguez brought the casings

15    to the police on March 28, 1997.  Investigators then went back to the crime scene during the

16    day on March 28, 1997, and recovered an additional expended .25 caliber shell casing.[8]

17    Priscilla Scott testified as follows.  She had been in a relationship with James Nellums

18    for the eight years, and they had an eight-year-old daughter.  In March 1997, they were living

19    together along with their daughter and Scott's four other children.[9]

20    / / / /

21

------

22    [6]#15, Ex. 2A, at 58-60 & 78.  See also #15, Ex. 2A, at 34-45 (testimony of the first responding patrol
officer regarding first observations of the crime scene and victims); *id.*, at 81-83 (an initially responding
23    neighbor); *id.*, at 84-92 (early responding friends); *id.*, at 92-102 (investigating detective).

24    [7]#15, Ex. 2A, at 40 & 43 (first responding patrol officer); *id.*, at 61 (Hilario Rodriguez);  *id.*, at 97 & 99-
100 (investigating detective James Jackson); #15, Ex. 2B, at 8 (investigating detective Jonathan Martin); #15,
25    Ex. 2B, at 32-39 (crime scene investigator Derek Nelson).

26    [8]#15, Ex. 2A, at 97-99 (detective); *id.*, at 102-12 (Maria Rodriguez); *id.*, at 112-14 (chain of custody
after delivery of the casings to the police); *id.*, at 114-20 (crime scene investigator Pamela Sword Frakes);
27    #15, Ex. 2B, at 32-36 & 49-50 (crime scene investigator Derek Nelson).

28    [9]#15, Ex. 2A, at 120-22.  Scott and her children also called Nellums "Squeaky."

On the evening of March 25, 1997, Nellums returned to the apartment after having been out. He came back inside with his bicycle, which was a dark blue Huffy mountain bike with chrome handlebars with black pads. Nellums walked directly to the bathroom, and he called Scott to the bathroom. When she got to the bathroom, there was blood everywhere. She asked him what happened, and Nellums told her that he had attacked two men walking in the desert.[10]

As he related to Scott, Nellums went to the desert that evening because Mexican-Americans got paid every Friday, and he wanted to see what he could get through a robbery. There were two men walking though the desert, and he came out from behind some bushes. Nellums attacked the smaller man first, but the larger man responded by attacking Nellums with a knife and cutting him on the arm. Nellums shot the two men, and he then left on his mountain bike. He said that the smaller man only had $2.[11]

Back at the apartment, Nellums had a still-bleeding cut to the left upper arm, on the inner side running from the shoulder toward the elbow. He had Scott wrap the wound with a towel. Nellums was wearing a black and turquoise Adidas jacket with a gray t-shirt under it and black jeans. Nellums asked Scott to get rid of the clothes, but Scott hid the jacket and shirt on the top shelf of the hall linen closet, behind some blankets. She and Nellums went to the store and bought a beer with the $2.[12]

The next day, a story about the attack in the desert was on the television news. When the newscast said that the larger man had died, Nellums said: "What, he died? Oh, well. He shouldn't have resisted." Thereafter, whenever the story would play over the course of the day, Nellums would repeat basically the same response.[13]

/ / / /

---

[10]#15, Ex. 2A, at 122 & 140.

[11]*Id.*, at 122-24, 145-46 & 148-49.

[12]*Id.*, at 123-26, 141, 143-44, 146-47 & 150-51.

[13]*Id.*, at 126-27.

1    Scott was afraid due to the fact that she was the only one that Nellums had told about
2    the crime.  They had a history of domestic violence.  Nellums told her that he knew that she
3    was the only one that knew and that he knew that she would not tell anyone.  She interpreted
4    his remarks as meaning that he would do the same thing to her as the victims if she talked.
5    As a consequence, she was afraid to tell anyone.[14]

6    In June 1997, Scott had been at her father's home for about a week, and the children
7    were at her mother's home.  On June 18, 1997, Nellums called Scott regarding her coming
8    home.  He asked whether she lived there anymore.  She responded that she still lived there.
9    He then told her that "I think you better get your mother f___ing ass home before I . . . kick
10   it all the way home."  He also referred to her mother, stating: "Tell your ball-headed ass mom
11   to bring you home."  This statement upset Scott, as her mother had lost all of her hair
12   because she was being treated for cancer.[15]

13   Right after the call, Scott's mother arrived at her father's house.  Scott told her mother
14   that she knew something that Nellums had done.  She then told her mother about Nellums
15   having shot the two men in March 1997.  Her mother urged her to contact the police, which
16   she did that day.[16]

17   The police took Scott's statement.  Her story had potential credibility because she knew
18   details regarding the crime that were not public knowledge.[17]

19   As discussed further below under Ground 1, Scott signed a written consent form giving
20   the police permission to search the apartment.[18]

21   When officers initially were reconnoitering the area outside the apartment prior to the
22   search, Nellums exited the apartment with a black mountain bike with knobby tires.  The

23   _____

24   [14]#15, Ex. 2A, at 127-28, 144-45 & 149.

25   [15]#15, Ex. 2A, at 128-30 & 145.

26   [16]*Id.*, at 130-32 & 142-43.

27   [17]*Id.*, at 131-32 (Scott); #15, Ex. 2B, at 10-16 & 29-30 (investigating detective Jonathan Martin).

28   [18]#15, Ex. 2A, at 132.

1    officers took Nellums into custody and impounded the bicycle.  At trial, both Priscilla Scott and

2    her daughter identified the bicycle as Nellum's bicycle; and Priscilla Scott testified that he had

3    come back to the apartment with that bicycle on the night of the attack.[19]

4          Nellums was observed to have a scar on his left arm, running between the shoulder

5    and bicep, when he was taken into custody.[20]

6          After Nellums was taken away, the police brought Priscilla Scott to the apartment and

7    effected the search.  Inside the apartment, the police recovered, *inter alia*: (a) a blood-stained

8    jacket and t-shirt from the hall linen closet; (b) a watch cap from the bedroom; (c) .25 caliber

9    ammunition from the top of the bedroom closet; and (d) a small, black .25 caliber pistol with

10    an obliterated serial number and a loaded magazine from the top drawer of a night stand in

11    the bedroom.  Scott testified that she was with Nellums when he purchased the weapon and

12    that the serial numbers had been scratched off.  She testified that the weapon was small

13    enough to fit in one's hand.  She further testified that the clothing recovered in the search was

14    the same clothing that Nellums was wearing on the night of the crime.   The clothing

15    substantially matched the description given by Hilario Rodriguez.[21]

16          The apartment was approximately 2.4 to 3.1 miles from the crime scene, depending

17    upon the route taken.[22]

18          Deputy medical examiner Dr. Robert Bucklin, M.D., testified that Nicholas Rodriguez

19    was hit by two bullets, one nonfatal bullet which passed through his body without striking any

20    vital structures and one fatal bullet.  He testified that Rodriguez died from a gunshot to the

21    chest that passed into the abdomen.  The fatal bullet passed through the aorta and the spinal

---

23    [19]#15, Ex. 2A, at 140 (Priscilla Scott); *id*., Ex. 2B, at 3-4 (Penny Scott); *id*., Ex. 2B, at 16-18 (Detective

24    Martin).

25    [20]#15, Ex. 2B, at 21 (Detective Martin); *id*., at 50-52 (transport officer).

26    [21]#15, Ex. 2A, at 132-37, 144 & 151 (Priscilla Scott); see also *id*., Ex. 2B, at 4-5 (testimony by Priscilla

27    Scott's daughter Penny regarding the jacket); *id*., Ex. 2B, at 18-22, 26-27 & 30-31 (Detective Martin); *id*., at 40-46 (crime scene investigator Nelson).

28    [22]Ex. 2B, at 21-24  (Detective Martin).

1  cord before becoming lodged in Rodriguez' spine.  During the autopsy, Dr. Bucklin recovered

2  the copper jacketed .25 caliber bullet and turned it over to a crime scene investigator.[23]

3       Richard Good, Sr., the forensic lab manager and a firearm examiner for the Las Vegas

4  Metropolitan Police Department, testified as follows:  Nellum's gun that was recovered during

5  the search was a .25 caliber semi-automatic Tangfolio pistol.  The .25 caliber bullet recovered

6  from Nicholas Rodriguez' body was fired from Nellum's weapon.  Moreover, the expended

7  shell casing initially found at the crime scene and the three casings found by Maria Rodriguez

8  all were ejected from Nellum's pistol.  The ammunition recovered during the search also was

9  of the same brand as the ammunition used in the attack.[24]

10      Good summarized his findings as follows:

11            . . . I am saying it is my belief that no other firearm ever
           manufactured was responsible for the markings found on the four
12            cartridge cases or the autopsy bullet.

13  #15, Ex. 2B, at 91.

14      Nellums wrote to Priscilla Scott while he was in jail awaiting trial.  The letter stated, *inter*

15  *alia*, "I have finally opened my heart to God and asked for forgiveness and pray I don't get put

16  to death for what has happen [sic]."[25]

17      Additional factual and procedural background pertinent to the individual claims

18  presented is set forth below in the discussion of the respective claims.

19                              ***Governing Law***

20      The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

21  deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 117 S.Ct. 2059,

22  2066 n.7(1997).  Under this deferential standard of review, a federal court may not grant

23  habeas relief merely on the basis that a state court decision was incorrect or erroneous.  *E.g.,*

24  *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Instead, under 28 U.S.C. § 2254(d),

25  _____

26      [23]#15, Ex. 2B, at 53-60 (Dr. Bucklin); see also *id.*, at 61-65 (chain of custody testimony).

27      [24]#15, Ex. 2B, at 70, 81-88 & 90-91.

28      [25]#15, Ex. 2A, at 137-40.

the federal court may grant habeas relief only if the decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16, 124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 16, 124 S.Ct. at 11.  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g., Mitchell*, 540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

To the extent that the state court's factual findings are challenged intrinsically based upon evidence in the state court record, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations.  *Id.*  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973. Rather, the AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

If the state court factual findings withstand intrinsic review under this deferential standard, they then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may be overturned based on new evidence offered for the first time in federal court, if other procedural prerequisites are met, only on clear and convincing proof.  393 F.3d at 972.

On a claim of ineffective assistance of counsel, the petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time.  The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Effective appellate advocacy requires weeding out weaker issues with less likelihood of success.  The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason – because the omitted issue has little or no likelihood of success on appeal.  *Id.*

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

-9-

*Discussion*

***Grounds 1 & 2:   Failure to Seek to Suppress Introduction of the Murder Weapon***

In Ground 1, petitioner alleges that he was denied effective assistance of counsel when his trial counsel failed to move to suppress introduction of the murder weapon into evidence. In Ground 2, he alleges that he was denied effective assistance of counsel when counsel failed to raise the issue on direct appeal.  Nellums alleges that Priscilla Scott did not have the authority to consent to a search of the bedroom night stand drawer where the weapon was located, because he allegedly exercised exclusive control over that particular drawer.

Priscilla Scott testified that she and Nellums had been in a relationship for eight years, had an eight-year-old daughter together, and had lived in the apartment for approximately five to six months.  She confirmed the authenticity of her signatures on the written consent form giving the police permission to search the apartment.  Prior to proceeding forward with the search based upon Scott's written consent, the police contacted the landlord and confirmed that both James Nellums and Priscilla Scott were named on the lease agreement.  Inside the apartment, Scott directed the police to, *inter alia*, Nellums' .25 caliber pistol.  The weapon was recovered from the top drawer of the night stand, on what Scott described at trial as her side of the bed, in what she described as her drawer.  Scott testified that, on the day following the shootings, she had seen the gun once again placed in the night stand drawer.[26]

There was no evidence to the contrary in the state court trial record.

In the state post-conviction proceedings, petitioner alleged that "[o]n 06-18-97 [the date of the search] Petitioner . . . was a co-tenant with Priscilla Scott . . . along with their daughter, Jasmine . . . ."  Nellums maintained that he and Scott were romantically involved when they initially rented the apartment but that the relationship had soured and had become strictly platonic.  He maintained that he had become romantically involved with another woman and that he "was living with Scott solely as a co-tenant for mutual financial benefits."  According to Nellums, his involvement with his new lover infuriated Scott, so much so that Scott went

---

[26]#15, Ex. 2A, at 132-35 & 151 (Scott); *id.*, Ex. 2B, at 15 (Detective Martin).

1    to the police and told them falsely that he had confessed to her.  He acknowledged in his

2    state court petition that she then signed a written consent to a search  "of her [and] Nellums'

3    apartment."  The copy of the signed consent form attached with the state petition stated, *inter*

4    *alia*, that Scott consented to "a complete search of the premises and property."[27]

5        Nellums alleged that the top drawer of the night stand – where the murder weapon was

6    found – was his exclusive property over which he exercised sole access and control.  He

7    alleged that the night stand had been given to him as a gift and that he allowed Scott to use

8    the bottom drawer only.  He alleged that he had specifically instructed Scott that he did not

9    want her or anyone else going inside the top drawer.  He asserted that he kept not only the

10   gun in the top drawer but also personal information regarding his new girlfriend.[28]

11       Nellums did not contest either the voluntariness of Scott's consent or that, as a co-

12   tenant, she generally had the authority to consent to a search of the apartment.  He

13   contended instead that he had a protected expectation of privacy in the top drawer of the

14   night stand and that Scott's consent to the search of the top drawer therefore was invalid

15   under the Fourth Amendment.    Nellums contended further that the search was

16   unconstitutional because the police deliberately arrested him and took him away from the

17   _____

18       [27]#15-11, Ex. 4, at 7 & Exhibit E001 thereto.  Petitioner cites to page 145 of the trial transcript in

19   support of his allegations regarding the purportedly platonic nature of his relationship with Scott on June 18,
     1997.  In the portion of Scott's testimony cited, however, she acknowledged only that – throughout their

20   relationship – she had been aware of Nellums' involvement with other women.  See #15, Ex. 2A, at 145 ("I
     have been aware of that for the past eight years we were together.").  She denied that his alleged involvement

21   with another woman was the subject of their particular problems in June 1997.  *Id.*  Scott's remaining
     testimony, summarized previously, contradicted rather than supported Nellums' description of their

22   relationship in June 1997.  In any event, under the case law discussed *infra*, any issue of fact as to the status
     of their relationship at the time of the search was not a material one.  It was undisputed, even under Nellums'

23   allegations four years after the fact in 2001, that Scott was a co-tenant with Nellums on June 18, 1997.

24       The Court further notes in passing that Nellums' suggestion that Scott falsely accused him of the
     shootings tends to be belied by the remaining evidence in the case tending to establish his guilt.  While the

25   question of whether evidence regarding the gun should have been suppressed is another matter, Nellums'
     assertion of actual factual innocence runs counter to substantial evidence of his guilt.

26

27       [28]#15-11, Ex. 4, at 8.  The testimony at trial did not reflect that any personal information regarding
     another woman was recovered during the search.  The only items reflecting personal information that were

28   inventoried during the search pertained to Nellums and Scott.  See,e.g., #15, Ex. 2-B, at 20.  Any factual
     dispute as to this point, too, ultimately is not material under the case law discussed *infra*.

                                              -11-

1   apartment without seeking his consent so that they could proceed with the search based upon

2   Scott's consent.  He additionally contends that the search was unconstitutional because the

3   police allegedly had a duty to instead obtain a search warrant because a neutral magistrate

4   was easily available to the police.  In order to establish his standing to challenge the search

5   of the drawer in particular, Nellums affirmatively alleged that he had full ownership of the top

6   drawer and its contents, including the .25 caliber handgun.[29]

7        Nellums alleged that he advised his trial counsel of all of the above alleged facts and

8   requested that he file a motion to suppress.[30]

9        In its June 13, 2005, decision on the state post-conviction appeal, the Nevada

10  Supreme Court rejected Nellums' claim of ineffective assistance of counsel on the following

11  basis:

12                . . . [T]rial counsel's failure to attack a clearly consensual
            search was perfectly reasonable.  The State emphasizes that
13          Nellums' girlfriend of eight years, Priscilla Scott, also lived in the
            apartment and consented to the search in writing.  She had clear
14          authority to consent to the search.  This court has stated that trial
            counsel need not "make every conceivable motion no matter how
15          remote the possibilities are of success."  Therefore, we conclude
            based on the clearly consensual search that Nellums' argument
16          lacks merit.

17  #15-17, Ex. 8, at 3-4.

18       Based upon the controlling case law that would have been available to counsel in 1997

19  and 1998, the Nevada Supreme Court's rejection of the petitioner's ineffective assistance

20  claims in Grounds 1 and 2 was neither contrary to nor an unreasonable application of clearly

21  established federal law as determined by the United States Supreme Court.  That is, the

22

23       [29]#15-11, Ex. 4, at 8-14.  Petitioner included factual allegations, at 12 and 14, that the police admitted
    that they had been waiting outside for a long time outside the apartment for Nellums to leave the apartment
24  so that they could arrest him and remove him from the scene.  At trial, however, the officer's testimony
    instead reflected that Nellums fortuitously exited the apartment while the police were checking out the exterior
25  area of the apartment in preparation for bringing in a SWAT team (because they knew Nellums was armed)
    before proceeding with the search.  There was no police testimony whatsoever that the police had completed
26  their preparation for the operation and thereafter had stopped and waited, for a long time or otherwise, for
    Nellums to exit the apartment. #15, Ex. 2B, at 15-16.  This factual point, too, however, was not necessarily a
27  material one under the governing case law available to defense counsel in 1997 and 1998.

28       [30]#15-11, Ex. 4, at 16.

1   Nevada Supreme Court's determination that a motion to suppress would not have had a

2   reasonable probability of success was neither contrary to nor an unreasonable application of

3   the United States Supreme Court's Fourth Amendment precedent at the relevant time.[31]

4   Because an attorney's performance must be assessed from the lawyer's perspective

5   at the time, it is established law that an attorney is not ineffective for failing to anticipate a

6   decision in a later case.  *See,e.g., Murtishaw v. Woodford*, 255 F.3d 926, 950 (9th Cir. 2001);

7   *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994); *United States v. Zweber*, 913 F.3d 705, 712

8   (9th Cir. 1990).  Thus, the question of whether trial counsel provided ineffective assistance of

9   counsel in not filing a motion to suppress must be considered in light of the controlling Fourth

10   Amendment case law in 1997 and 1998.

11   In the state courts, Nellums did not challenge the actual authority of his co-tenant Scott

12   to consent generally to the search of the apartment and bedroom that they shared, as it was

13   established law that she had such authority.  The United States Supreme Court confirmed in

14   *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), a case involving

15   a common law wife sharing a bedroom with the defendant, that the voluntary consent of any

16   joint occupant of a residence to search the jointly occupied premises is valid against another

17   co-occupant.  415 U.S. at 169-172, 94 S.Ct. at 992-93.[32]  Ninth Circuit case law following

18   *Matlock* further supported the conclusion that a female occupant retained such actual

19   authority even where she had left the domicile in a domestic dispute while leaving behind her

20   belongings in the joint domicile.  *See United States v. Brannan*, 898 F.2d 107, 108 (9th Cir.

21   1990); *United States v. Long*, 524 F.2d 660, 661 (9th Cir. 1975).  Accordingly, a conclusion

22   _____

23   [31]The state courts rejected the petitioner's claims without an evidentiary hearing, and this Court
     therefore has assumed, *arguendo*, that the petitioner's sworn material factual allegations in his state petition

24   are true.  However, on a motion to suppress, the petitioner's factual allegations would have been subject to a
     determination as to his credibility as against any contrary testimony and other evidence offered through other

25   witnesses.  State post-conviction counsel made an unsworn statement in an appellate brief that Scott's
     original police statement supported Nellums' argument that Scott knew that she did not have access to the

26   top drawer of the night stand. #15-14, Ex. 5A, at 15.  It does not appear that any evidence was presented to
     the state courts supporting this bald and unsworn allegation that was made for the first time on appeal.

27

28   [32]*See also United States v. Wilson*, 447 F.2d 1, 5-6 (9th Cir. 1971)(girlfriend living with defendant in
     apartment could validly consent to search of the apartment even though she did not pay rent).

that Nellums' co-tenant Scott retained her actual authority to consent to a search of the premises and shared bedroom would not have been either contrary to or an unreasonable application of clearly established federal law, regardless of the then-current status of their relationship with one another.  As petitioner acknowledged in the state courts, Scott was a co-tenant with common authority generally over the premises on the date of the search.[33]

Nellums' principal argument in the state courts instead focused upon whether Scott had actual authority to consent specifically to a search of the top drawer of the night stand where the murder weapon was found – based upon his allegation that he forbade her access to that particular drawer of the night stand.

The Nevada Supreme Court's implicit conclusion that Scott's actual authority extended to a search of the particular drawer was neither contrary to nor an unreasonable application of clearly established federal law.  The Ninth Circuit held in *United States v. Sealey*, 830 F.2d 1028 (9th Cir. 1987), that a wife and co-owner of the residence had actual authority to permit a search of all areas of the home, including the garage that her husband had forbade her to go into.  There was nothing establishing that the husband in fact actually *had the authority* to deny the wife equal access by forbidding or restricting her access to the garage, and "[a]s part owner and occupant, [the wife] had mutual access to the entire premises and valid authority to consent to the search of the garage."  830 F.2d at 1031.  The Ninth Circuit further rejected the husband's argument in *Sealey* that the wife did not have the authority to consent to the search of covered plastic buckets and sealed PVC pipes in the garage.  The Court of Appeals noted, first, that the containers were not marked in any way to indicate the husband's alleged sole ownership, second, that the wife did not disclaim an ownership interest in them, and third, that the containers were not the sort of containers – such as suitcases, strong boxes, and footlockers – commonly used to preserve privacy.  The Ninth Circuit accordingly held that

---

[33]*See also United States v. Guzman*, 852 F.2d 1117, 1121-22 (9th Cir. 1988)(possession of a key by the defendant's wife who was a lessee and occasional resident of the apartment "in itself" had "special significance"); *accord United States v. Yarbrough*, 852 F.2d 1522, 1534 (9th Cir. 1988)("A party who 'has the key to the premises and access throughout the residence' can give valid consent to search."); *United States v. Dubrofsky*, 581 F.2d 208, 212 (9th Cir. 1978)(similar).

the wife "had valid authority to consent to the search of the sealed containers."  830 F.2d at 1030-31.[34]

The cases from other jurisdictions upon which petitioner relies in his argument as to the particular drawer all concerned the type of containers that the Ninth Circuit distinguished in *Sealey*, *i.e.*, containers commonly used to preserve personal privacy in a shared area, such as a suitcase, strong box, footlocker, duffel bag, or purse.[35]  Petitioner cites no controlling authority holding that a particular drawer in a night stand by a shared bed is the type of container typically used to preserve privacy as against the other person sharing the bedroom. In all events, cases decided by other state courts or by federal lower courts – even if otherwise on point – were not binding up on the Nevada Supreme Court.  As a state supreme court, the court was bound only by controlling United States Supreme Court precedent.

Moreover, even within the context of containers commonly used to preserve personal privacy, the United States Supreme Court has disapproved of the sort of constitutional parsing between portions of a shared container such as Nellums attempts to do here.  In *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), two cousins shared a duffel bag but the defendant cousin claimed that his cousin had permission to use only one

_____

[34]*See also Sealey*, 830 F.3d at 1032 (Norris, J., concurring in part and dissenting in part)(while disagreeing with the majority regarding the constitutional validity of sawing open the sealed PVC pipes, the partially dissenting judge stated that the wife's "consent to search for drugs was broad enough to authorize the officers to open bureau drawers"); *United States v. Cornejo*, 598 F.2d 554, 556 (9th Cir. 1979) (lessee validly consented to search of dresser where weapon was found).

In citing to Ninth Circuit authority, this Court does not suggest that the Supreme Court of Nevada was bound to follow Ninth Circuit precedent.  However, if Ninth Circuit law at the relevant time held to the contrary of the petitioner's argument, it would not have been an objectively unreasonable application of clearly established federal law for the state supreme court to also reject the argument.

[35]*See State v. Evans*, 45 Haw. 622, 632, 372 P.2d 365, 372 (1962)(cufflink case that "clearly was identifiable as the husband's," with the court stating "we do not have here the situation where, at the time of the search, it does not appear whose case is being opened"); *United States v. Block*, 590 F.2d 535, 541 & n.8 (4th Cir. 1978)(mother did not have authority to consent to search of son's footlocker, with the court stating that "[o]bviously, not every 'enclosed space' within a room . . . can claim independent status as objects capable of search"); *In re Scott K.*, 24 Cal.3d 395, 595 P.2d 105 (1979)(father did not have authority to consent to search of son's locked toolbox as to which the father had disclaimed any ownership interest); *State v. Williams*, 48 Or.App. 293, 616 P.2d 1178 (1980)(latched cassette tape case located in van); *United States v. Poole*, 307 F.Supp. 1185 (E.D. La. 1969)(apartment guest's closed overnight bag in closet).

-15-

1    compartment within the bag, such that he did not have consent to a search of the remaining
2    compartments in the bag.  The United States Supreme Court declined to "engage in such
3    metaphysical subtleties," and the Court held that the defendant had assumed the risk that his
4    cousin would allow someone else to access the shared bag.  394 U.S. at 740, 89 S.Ct. at
5    1425.  In the present case, Nellums acknowledged that he and Scott shared the night stand
6    in the shared bedroom, but he maintained that she had permission to use only one drawer
7    in the night stand.  The Nevada Supreme Court's rejection of such a Fourth Amendment
8    argument was not an unreasonable application of the clearly established federal law in
9    *Frazier*.

10        Ninth Circuit case law at the time of the petitioner's trial similarly was in accord that a
11   defendant could create actual authority in a third party to validly consent to a search by virtue
12   of conduct by the defendant that assumed the risk that the third party might access the area
13   without the defendant's permission.  *See,e.g., United States v. Kim*, 105 F.3d 1578, 1582-83
14   (9th Cir. 1997).

15        The Nevada Supreme Court's rejection of Nellums' claim that Scott did not have actual
16   authority to consent to a search of the particular drawer in the night stand where the murder
17   weapon was found therefore was neither contrary to nor an unreasonable application of
18   clearly established federal law as determined by the United States Supreme Court during the
19   period of time at issue.

20        Even if, *arguendo*, Scott did not have actual authority to consent to a search
21   specifically of the top drawer of the night stand, the search of the drawer nonetheless would
22   be valid if she had apparent authority, *i.e.*, if the officers had an objectively reasonable belief
23   that Scott had authority over the entire premises including the top night stand drawer as well.
24   *See Illinois v. Rodriguez*, 497 U.S. 177, 186-89, 110 S.Ct. 2793, 2800-02, 111 L.Ed.2d 148
25   (1990). Nellums contends that the officers had a duty to inquire specifically whether Scott had
26   access to the top drawer of the night stand.  He cites no apposite and controlling authority,
27   however, imposing such a duty upon the officers on the facts of this case.  There is nothing
28   inherent to a particular drawer of a shared night stand in a shared bedroom – a night stand

that otherwise can be searched – that would put a reasonable officer on notice that the drawer was accessible only to one of the occupants of the shared room but not the other.  A rejection of Nellums' claim that the officers did not have an objectively reasonable belief that Scott had authority to consent to the search of the particular drawer was neither contrary to nor an unreasonable application of *Illinois v. Rodriguez* and clearly established federal law.[36]

Nellums further contended in the state courts that the search was constitutionally invalid because the police allegedly deliberately arrested him and took him away from the apartment without seeking his consent so that they instead could proceed with the search based upon Scott's consent.

The Nevada Supreme Court's rejection of this argument was neither contrary to nor an unreasonable application of clearly established federal law, based upon the controlling United States Supreme Court case law available at the time of the petitioner's trial.  That is, under the controlling case law at the time, a determination that this argument would not have had a reasonable probability of success was not an objectively unreasonable application of then clearly established federal law.

Notably, in *United States v. Matlock*, the police similarly arrested the defendant outside the residence and asked a third party for consent to search without instead asking the defendant himself.  *See* 415 U.S. at 166, 94 S.Ct. at 991.  At the time of the petitioner's original criminal proceedings in 1997 and 1998, the law was well-established in the Ninth Circuit that a co-tenant could validly consent to a search of the premises even if another co-

---

[36]*See also State v. McCaughey*, 127 Idaho 669, 904 P.2d 939 (1995)(officers did not know of steps taken by husband to keep wife out of shed and basement and therefore reasonably believed that wife had authority to consent to search these areas).

Petitioner relies upon *Nix v. State*, 621 P.2d 1347 (Alaska 1981), for the proposition that the police may not proceed without inquiry in ambiguous circumstances.  The court held in *Nix*, however, that the officers did reasonably believe that the third party had authority to consent to the search, and the facts in *Nix* are entirely distinguishable from the present case.  The presence of a night stand with drawers does not present ambiguous circumstances.  Petitioner's reliance upon *United States v. Isom*, 588 F.2d 858 (2d Cir. 1978), similarly is misplaced.  That case involved a search of a guest's locked box, and the court ultimately ruled that the search was valid on other grounds.  A night stand drawer is not a locked box.  Moreover, again, the Supreme Court of Nevada was not required to follow either Alaska or federal Second Circuit authorities.

tenant expressly objected to the search.  *See United States v. Morning*, 64 F.3d 531, 534-36 (9th Cir. 1995); *United States v. Valencia-Roldan*, 893 F.2d 1080, 1081-82 (9th Cir. 1990)(in *Valencia-Roldan*, one co-tenant consented and another co-tenant other than the defendant objected); *see also United States v. Childs*, 944 F.2d 491, 494-95 (9th Cir. 1991).  There was no Ninth Circuit case law holding that a co-tenant's consent to the search was valid only so long as the police had not removed the defendant to avoid a possible objection.  The search would have been valid under then-current Ninth Circuit precedent even if Nellums had remained at the scene and objected to the search consented to by his co-tenant Scott.[37]

Well *after* the petitioner's trial, direct appeal, and post-conviction appeal, the United States Supreme Court held in *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), that a warrantless search is invalid where one occupant refuses permission to search even though another occupant with authority consents to the search. 547 U.S. at 120.  The Court further held that a co-tenant's consent to search is valid only so long as there is no evidence that the police removed the potentially objecting tenant for the sake of avoiding a possible objection.  547 U.S. at 121.

As noted at the outset, because an attorney's performance must be assessed from the lawyer's perspective at the time, it is established law that an attorney is not ineffective for

---

[37]Petitioner urges that the Ninth Circuit held in *United States v. Impink*, 728 F.2d 1228 (9th Cir. 1984), that the police must invariably seek consent from the suspect before relying upon third party consent. #1, at electronic docket page 27 of 51.  The Ninth Circuit instead stated exactly the opposite: "We *do not* hold that police must invariably seek consent from the suspect before relying on a third party's consent."  728 F.2d at 1234 (emphasis added).  Moreover, *Impink* involved a case where the defendant tenant had a superior privacy interest in the property to the landlord.  In both *Morning* and *Valencia-Roldan*, the Ninth Circuit declined to extend *Impink* to a situation where, *inter alia*, co-tenants enjoyed an equal right of access to the property, and the Court of Appeals held that one co-tenant could constitutionally authorize a search even when another co-tenant was present and objected to the search.  *Morning*, 64 F.3d at 535; *Valencia-Roldan*, 893 F.2d at 1081-82.  The Supreme Court of Nevada in all events was not required to follow a holding of the Ninth Circuit in determining whether a motion to suppress would have been granted, much less any *dicta* found in *Impink*.

The Nevada Supreme Court further was not required to follow the federal district court decision in *United States v. Ruffner*, 51 F.2d 579 (D.Md. 1931), which involved consent by an employee rather than a co-tenant and which was decided over 40 years prior to the Supreme Court authority in *Matlock*.  Nor was the state high court required to follow the Tennessee appeals court decision in *Hembree v. State*, 546 S.W.2d 235 (Tenn.Cr.App. 1976), which involved consent to search by a son.  The Nevada Supreme Court, again, is bound only by United States Supreme Court authority existing at the relevant time.

failing to anticipate a decision in a later case.  *See, e.g., Murtishaw, supra*.  Trial counsel accordingly was not ineffective for failing to anticipate the Supreme Court's decision in *Georgia v. Randolph* nearly a decade later.  If further was not an objectively unreasonable application of clearly established federal law for the Nevada Supreme Court to conclude in 2005 that there was not a reasonable probability that Nellums' argument would have proved successful under the controlling law in 1997 and 1998.  *See Morning, supra*.[38]

Finally, Nellums contended that the search was unconstitutional because the police allegedly had a duty to instead obtain a search warrant because a neutral magistrate was easily available to the police.  The cases upon which he relies do not involve a situation where consent to search was obtained and do not support the broad proposition made.[39]

Accordingly, the Nevada Supreme Court's conclusion that counsel was not ineffective for failing to file a motion to suppress -- because the motion would not have had more than a remote chance of success -- was neither contrary to nor an unreasonable application of clearly established federal law as of the time of the petitioner's trial.[40]

With particular regard to the claim of ineffective assistance of appellate counsel in federal Ground 2, appellate counsel similarly was not ineffective for failing to pursue a claim with only a remote chance of success at best under then-existing law.  Moreover, it would have been futile to pursue a claim on appeal that had not been raised in the district court.

Grounds 1 and 2 therefore do not provide a basis for federal habeas relief.

---

[38]In the federal reply, petitioner alleges for the first time – in his argument under the new decision in *Georgia v. Randolph* – not merely that he was taken away without being asked for his consent to the search but that he in fact vigorously objected to the search.  While this factual allegation was not presented to the state courts, Nellums' *arguendo* actual objection to the search would not have made a difference under then-existing case authorities such as *Morning*.

[39]The holding in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), was that a warrant issued through an enforcement officer, the Attorney General, rather than through a neutral magistrate was invalid.  The district court decision in *United States v. Brewer*, 343 F.Supp. 468 (D. Hawaii 1972), did not involve consent to search and was not binding upon the Supreme Court of Nevada.

[40]*See also United States v. Fay*, 410 F.3d 589, 590-91 (9th Cir. 2005)(Noonan, J., concurring)(a felon living with his girlfriend who tells her that he is keeping a gun in the house has no privacy claim that prevents her from disassociating herself from his criminal conduct and from ridding her home of the gun by asking the police to remove it).

***Ground 7:   Failure to Collect and Preserve Evidence from Knife***

In Ground 7, petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to collect and preserve fingerprint, blood and DNA evidence from a knife allegedly recovered by the State.[41]

According to Hilario Rodriguez' trial testimony, when he approached his father after the assailant left, he saw a knife in his hand.  It was a folding knife that opened with a push-button.  His father still was alive at that point, and he said to Hilario Rodriguez: "This asshole really kill us."  Rodriguez took the knife from his father, and he later gave the knife to a friend

---

[41]Petitioner voluntarily dismissed the unexhausted claims in Grounds 3 through 6.

In the federal reply (#25), petitioner asserts – for the first time – distinct new legal claims that trial counsel was ineffective: (a) for failing to object to the alleged perjured testimony at the preliminary hearing that Hilario Rodriguez did not know anything regarding a knife; (b) for failing to investigate the whereabouts of the knife; and (c) for failing to object and seek a mistrial during the State's opening statement when the State referred to the knife.  These new legal claims were not presented in state Ground 7, and it does not appear likely that the claims were exhausted in the state courts.  To exhaust a federal claim in the state courts, the petitioner must present *both* the operative facts and the federal legal theory upon which the claim was based.  *E.g., Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005).  None of the above bases of alleged ineffective assistance were presented in state Ground 7.

In this Court, subsequent to the reply, petitioner filed a motion to stay the proceedings so that he could pursue another unexhausted claim.  The Court struck the motion because petitioner did not properly serve the motion on opposing counsel.  However, the Court gave the petitioner an opportunity to file an amended petition.  The Court informed the petitioner that – given the late juncture in these proceedings – any motion to amend would have to demonstrate – separately as to any new claim or allegation – that the amendment would not be futile given considerations of, *inter alia*, exhaustion, procedural default, and timeliness.  See #27.  Petitioner never took the opportunity to seek leave to amend to add new claims.

Given the procedural history herein, including the petitioner's failure to seek leave to amend the petition after being given an opportunity to do so, the Court will not consider any new legal claims raised for the first time in the federal reply.  Under Rule 15 of the Federal Rules of Civil Procedure, the procedure for presenting new claims after the respondents have answered is by seeking leave to amend, not by inserting new claims for the first time in the federal reply.

The Court further notes that the new claims in any event would appear to be without merit.  *First*, from the record presented, it does not appear that defense counsel would have been aware at the time of the preliminary hearing that Rodriguez was not testifying truthfully about a knife.  Nor is it likely that alleged perjury at the preliminary hearing would provide a basis for any relief at the subsequent trial, particularly where the testimony was corrected at trial and the varying testimony was explored on cross-examination.  *Second*, the record presented does not reflect that defense counsel had information prior to trial that would lead to the discovery of the whereabouts of the knife.  Moreover, even more significantly, as discussed in the text with regard to the exhausted claim in federal Ground 7, it is entirely speculative that forensic testing of the knife, if ever found, in fact would have produced exculpatory evidence.  *Third*, the State's reference to the knife in its opening statement would not appear to provide a basis for a mistrial.

to hold.  He took the knife from his father at the scene because he did not want his father to get into trouble for having a knife, as they were not in the United States legally.  He later gave the knife to his sister as a memento, and, as of the trial, he had not seen the knife after that time.[42]

Antonio Meza testified that Hilario Rodriguez gave him a folding knife with a push-button.  He gave the knife back to Rodriguez after he left the hospital.  Rodriguez did not say anything to Meza as to why he wanted him to hold the knife.[43]

During his preliminary hearing testimony, Rodriguez denied any knowledge of a knife.[44]

At the time of the initial investigation, police officers and crime scene investigators observed blood on the ground near the father's body.  Crime scene investigator Derek Nelson observed blood on the ground and also blood on a guard rail.  Nelson photographed the blood but did not collect any samples because he had no information at the time that the blood was from anyone other than the victim.[45]

According to the testimony of Detective Jonathan Martin, the police learned for the first time that Nicholas Rodriguez had cut Nellums with a knife when Priscilla Scott gave her statement to the police on June 18, 1997, nearly three month after the crime.  No one had stated anything to the police regarding a knife at any point prior to that time, and the police did not have any information that the assailant had been cut with a knife when they did their initial investigation in March 1997.[46]

In the present claim, petitioner challenges trial counsel's failure – once the knife allegedly was discovered by the State well after the fact – to have fingerprint, blood, and DNA

---

[42]#15, Ex. 2A, at 61-64.

[43]#15, Ex. 2A, at 86-88.

[44]#15, Ex. 2A, at 75-76.

[45]#15, Ex. 2A at 43 (first responding patrol officer); *id.*, Ex. 2B, at 26 (Detective Martin); *id.*, Ex. 2B, at 34-39 & 47-49 (Nelson); see also #15, Ex. 2A, at 105 (Maria Rodriguez).

[46]#15, Ex. 2B, at 12-13 & 29-30 (Detective Martin).

1  testing conducted on the knife.  He alleged in the state courts, without tendering any

2  supporting evidence, that the results of such testing would have been exculpatory.

3       The Supreme Court of Nevada rejected this claim on the following grounds:

4          [T]rial counsel's decision to forego investigation of the knife

5          used by the victim to attack his assailant was reasonable.  Going
further, in light of the substantial evidence in the record that

6          supports the State's case, Nellums has not demonstrated any
prejudice from this alleged failure.  In particular, police obtained

7          concrete physical evidence from Nellums' residence, including a
weapon and a jacket, that tied Nellums to the offense.

8  #15-17, Ex. 8, at 3.

9       The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

10  unreasonable application of *Strickland*.

11       At the very outset, Nellums presents this claim as though the State disclosed at trial

12  that it knew the whereabouts of the knife.  Petitioner supports this proposition, however, by

13  citing to Hilario Rodriguez' testimony at trial, in which he states that he gave the knife to his

14  sister and that he had not seen the knife since that time.[47]  This testimony does not at all

15  establish that the State then had the knife in its possession, that the State then in fact could

16  obtain it, or that trial counsel then would have been able to arrange for forensic testing of the

17  knife in the middle of the trial.  The underlying premise of this claim – that trial counsel could

18  have conducted forensic testing of the knife – thus is entirely speculative and suspect.

19  Nothing in the record establishes that the knife in fact was available for forensic testing.

20       In any event, petitioner's claim that forensic testing of the knife would have resulted in

21  exculpatory evidence also was entirely speculative.  Under Nevada state post-conviction

22  practice, a petitioner must attach affidavits, records or other evidence supporting the factual

23  allegations of the petition, and he may not present merely an unsubstantiated claim.  *See*

24  N.R.S. 34.370(4).  Petitioner's claim that forensic testing of the knife – if the knife in fact had

25  been available for testing – would have produced exculpatory evidence was wholly

26  unsubstantiated and based upon nothing more than speculation.

27  ―――――――――――

28      [47]Compare #1, at electronic docket page 46 of 51 with #15, Ex. 2A, at 61-64.

1     Finally, the evidence against Nellums – including evidence establishing without doubt

2  that his .25 caliber handgun was the murder weapon – was overwhelming.  Petitioner did not

3  tender evidence to the state courts tending to demonstrate that there was a reasonable

4  probability that forensic testing of the knife would have produced evidence that would have

5  outweighed the substantial evidence of guilt.

6     The state high court's rejection of this claim accordingly was neither contrary to nor an

7  unreasonable application of clearly established federal law.

8     Ground 7 therefore does not provide a basis for federal habeas relief.

9  ***Ground 9*:   *Failure to Introduce Medical Records***

10    In Ground 9, petitioner alleges that he was denied effective assistance of counsel when

11 trial counsel failed to present Nellums' medical records at trial to rebut evidence that he had

12 been cut on his left arm during the shooting and murder.[48]

13    Petitioner attached with his state petition purported medical records from the University

14 Medical Center for an admission on May 8, 1991, for stab wounds.  Petitioner maintains that

15 the medical records from six years prior to the shootings would have established a different

16 cause for the scar or scars on his left arm other than being cut by Nicholas Rodriguez.[49]

17    Petitioner alleges that he asked counsel to obtain the records, but he did not do so.

18    The Supreme Court of Nevada rejected this claim on the following grounds:

19         [A]lthough the failure to acquire Nellums' medical records
         concerning a prior arm injury was arguably unreasonable,
20       Nellums has shown no prejudice from the failure.  Detective
         Martin and Priscilla Scott both testified that Nellums received a
21       cut on his arm on the night of the incident.  Thus, we conclude
         that Nellums failed to demonstrate a reasonable probability, that,
22       but for counsel's alleged error, the result of the proceeding would
         have been different.
23
   #15-17, Ex. 8, at 3.
24
        / / / /
25

26 _____

27    [48]Petitioner voluntarily dismissed the unexhausted claim in Ground 8.

28    [49]#15-12, Ex. 4, Exhibit E002 thereto, at electronic docket pages 15-17 of 23.  The alleged medical
   records are cryptic and barely legible, but they are not necessarily inconsistent with petitioner's allegations.

-23-

1     The state high ourt's rejection of this claim was neither contrary to nor an unreasonable

2     application of *Strickland*.  Petitioner faced overwhelming evidence at trial, including evidence

3     that the fatal bullet came from his .25 caliber handgun.  It was not an objectively unreasonable

4     application of clearly established federal law for the state supreme court to conclude that

5     there was not a reasonable probability that producing evidence that a scar or scars on

6     Nellums' arm may have come from another incident would have affected the outcome at

7     trial.[50]

8     ───────────────────

9     [50]Petitioner relies in his reply upon *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389
      (2000), for the proposition that he had a constitutionally protected right to present mitigating evidence.
10    *Williams* involved a failure to present mitigating evidence during the penalty phase of a capital murder trial.
      *Williams* has nothing to do with issues concerning the presentation of potential exculpatory evidence in the
11    guilt phase of a trial.

12         Petitioner further urges in a "summary" section of his federal reply, *inter alia*, that, but for trial
      counsel's "ill advice" to not testify because of his felony conviction on the weapon charge, he would have
13    taken the stand in his own defense and testified that he purchased the handgun almost a month after the
      shootings.  He maintains in the summary section that his conviction should be set aside because of "all of the
14    cumulative ineffective assistance of trial counsel errors."  #25, at 15-17.

15         Looking specifically at Ground 9, these new, and apparently unexhausted, allegations have no
      bearing upon the Nevada Supreme Court's rejection of that claim.  The record before the state supreme court
16    did not contain any evidence tending to establish that petitioner did not own the gun at the time of the
      shootings, and all of the available evidence in the state trial record – including in particular Scott's testimony –
17    instead tended to establish that Nellums both owned and used the gun in murdering Nicholas Rodriguez and
      shooting Hilario Rodriguez.  Petitioner's late-breaking allegations in federal court as to what he "would have"
18    testified to "if" he had taken the stand nearly a decade earlier do not render the state supreme court's
      assessment of prejudice on Ground 9 – based upon the evidence that instead actually was in the state trial
19    record – either contrary to or an unreasonable application of *Strickland*.

20         To the further extent that petitioner seeks in his "summary" section in the reply to present new claims
      for the first time separate and apart from Ground 9, the Court declines to consider the claims.  As discussed
21    in more detail in note 41, *supra*, the petitioner was afforded an opportunity on a different claim to seek leave
      to amend to add new claims but did not avail himself of that opportunity.  Under Rule 15 of the Federal Rules
22    of Civil Procedure, the procedure for presenting new claims after the respondents have answered is by
      seeking leave to amend, not by inserting new claims for the first time in the federal reply.

23

24         The new and apparently unexhausted claims in the "summary" section of the reply further in any
      event would appear to be without merit.  *First*, any ineffective assistance claim based upon allegedly
25    erroneous advice to not testify would appear to be without merit.  The rule in the Ninth Circuit is that a
      knowing and voluntary waiver of the right to testify is presumed when a defendant sits silently by when his
26    attorney does not call him during the defense case-in-chief.  *See,e.g., United States v. Pino-Noriega*, 189
      F.3d 1089, 1094-95 (9th Cir. 1999).  The state trial record reflects that the state trial judge fully advised
27    Nellums of his rights concerning taking the stand in his own defense.  Trial counsel initially stated at one
      time that he understood that it was Nellums intention to testify.  However, when the State rested on the record a
28                                                                                        (continued...)

1    Ground 9 therefore does not provide a basis for federal habeas relief.

2        IT THEREFORE IS ORDERED that the remaining claims in the petition for a writ of

3    habeas corpus shall be DENIED on the merits and that this action shall be DISMISSED with

4    prejudice.[51]

5        The Clerk of Court shall enter final judgment accordingly, in favor of respondents and

6    against petitioner, dismissing this action with prejudice.

7        DATED:   September 5, 2008.

8

9

10   _____
     ROGER L. HUNT

11   Chief United States District Judge

12

13

14

15

16

17

18

19   _____

20   [50](...continued)

21   short time later, defense counsel stated that the defense was calling no witnesses and rested.  The record
     does not reflect any on-record action by Nellums challenging defense counsel's action in resting without

22   presenting his testimony.  See  #15, Ex. 2B, at 94-98.  This Court further is not sanguine that there was a
     reasonable probability that self-serving testimony by Nellums that he purchased the weapon after the

23   shootings – rather than before as Scott testified – would have changed the outcome at trial.  *Second,* there is
     no freestanding actual innocence claim in noncapital habeas.  *See Herrera v. Collins*, 506 U.S. 390, 113 S.Ct.

24   853, 122 L.Ed.2d 203 (2006).  *Third,* the Court is not persuaded that petitioner has presented claims of
     cumulative ineffective assistance that have any more merit in the aggregate than they have in isolation as

25   separate claims.

26   [51]To the extent that petitioner challenges his conviction for possession of a firearm by an ex- felon,
     none of the circumstances presented in the foregoing claims, viewed objectively, would have prompted a

27   defendant in Nellums' situation to not enter a plea and instead insist on going to trial on the weapon charge.
     The claims therefore do not provide a basis for overturning that conviction.  *See Tollett v. Henderson*, 411

28   U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203
     (1985).